[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action was instituted by Infinex Investments, Inc., Infinex Insurance Agency, Inc. (hereinafter Infinex Investments, Infinex Insurance or Infinex), and Ridgefield Bank against the Plaintiff's former employee, Joseph W. Dise, and his present employer, Prudential Securities Incorporated (Prudential), seeking temporary and permanent injunctive relief, as well as damages, under the Connecticut Uniform Trade Secret Act, Connecticut Unfair Trade Practices Act, and for common law for breach of contract, breach of loyalty, tortious interference with business and contractual relations, and for infliction of damage to CT Page 15359 business reputation.
Infinex Investments is a corporation organized and existing under the laws of the State of Connecticut, having its principal offices and place of business at 10 Waterside Drive, Farmington, Connecticut, 06032. Infinex Investments is a member of the National Association of Securities Dealers, Inc. (NASD). Infinex Insurance is also a corporation organized and existing under the laws of the State of Connecticut, having its principal offices and place of business at 10 Waterside Drive, Farmington, Connecticut, 06032. Infinex Insurance is not a member of the NASD. Ridgefield Bank is a bank having its principal place of business at 150 Danbury Road, Ridgefield, Connecticut. Ridgefield Bank is not a member of the NASD. Dise and Prudential are also NASD members. The NASD has an arbitration panel to resolve disputes among its members, persons "associated with a Member," and "certain others" in certain situations.
Dise received his training and began his career in the securities sales field in 1992, with Merrill Lynch, Pierce, Fenner Smith, Inc. (Merrill Lynch). While there, he became licensed to sell securities, insurance annuities and life and health insurance. In 1995, while working for Merrill Lynch, and after discussions with Gary Smith, the President and C.E.O. of Ridgefield Bank, Dise was hired by Ridgefield Bank and Infinex Investments.[1] Infinex and Ridgefield Bank have a relationship whereby Infinex places securities salesmen in banks. Dise was hired as a joint employee of Infinex and Ridgefield Bank in an effort to increase the amount of securities business at the bank.
Dise and Smith specifically discussed the Plaintiffs' desire that Dise bring his customers from Merrill Lynch to them. The Plaintiffs sought to employ Dise because he was well known in the Ridgefield community and would likely be able to bring additional customers to them. It is standard practice in the securities industry for brokers who change employers to send announcements to their customers advising of how and where the broker may be contacted.
Immediately after commencing employment with the Plaintiffs, Dise and the Plaintiffs sent letters to all his clients at Merrill Lynch and placed advertisements in the local newspaper announcing his change of employment. As a result of these efforts, approximately 80 percent or more of Disc's Merrill Lynch clients moved their accounts from Merrill Lynch to Ridgefield Bank. These accounts presently amount to approximately $60 million. At no time after commencing his new position did anyone associated with Infinex provide Dise with a list of customers or clients. Dise's customer base was developed primarily as a result of his involvement with the Ridgefield Chamber of Commerce, his Board of Director membership with the United Way and its fund distribution CT Page 15360 committee, his position of parish counsel for his church, and his coaching efforts for two T-ball teams and a softball team. The personal relationships, good will and reputation he developed as a result of his time and effort resulted in the success he achieved in the brokerage business.
The Plaintiffs hired Dise as an at will employee. His initial 1995 employment agreement with Infinex Investments and Ridgefield Bank contained neither a term nor a covenant not to compete. In October, 1996, the Defendant was presented with a new employment agreement changing the terms and conditions of his previous agreement. He was advised that if these new terms were not agreeable his employment would end. The 1996 contract added Infinex Insurance as an employer, continued Dise as an employee at will, and added the restrictive covenant at issue.
Sometime during the first half of 2000, Dise met an employee of the Defendant, Prudential. At the end of August, after several meetings, Prudential offered Dise a position with a compensation and benefit package far more lucrative than that which he had with the Plaintiffs. On October 6, 2000, Dise signed an employment agreement with Prudential. Immediately thereafter, as he had done when he began working for the Plaintiffs, Dise mailed notices of his change of employment, with an offer to continue service, to approximately two hundred to two hundred-fifty of his customers. These notes also included account transfer forms, each with the customer's name, account number and social security number. Prior to leaving the bank, Dise copied his customers' account statements and provided copies to Prudential for use in preparing the account transfer forms.
No evidence was presented by the Plaintiffs of the number of clients who transferred brokerage accounts to Prudential Securities, or of the loss of any checking accounts, savings accounts, business or revenue as a result of the Dise's departure.
Dise is the sole wage earner in his family.
The Plaintiffs filed a complaint on October 11, 2000, seeking a preliminary injunction affording the following relief:
 Enjoining Mr. Dise and Prudential, whether directly or indirectly, and whether alone or in concert with others . . . from:
 (a) soliciting by mail, phone and/or personal meeting and/or otherwise contacting customers of CT Page 15361 [Infinex and Ridgefield Bank] whose names became know to Mr. Dise as a direct or indirect result of his employment at [Infinex and Ridgefield Bank] for a one-year period;
 (b) Disclosing at any time any trade secrets or confidential or proprietary information of [Infinex and Ridgefield Bank], including without limitation any information about investment customers accounts or portfolios, customer lists, preferences and characteristics, and customer development and service strategies, all of which was not generally known or publicly available outside of [Infinex and Ridgefield Bank], and requiring Mr. Dise and Prudential to immediately return all originals and copies of documents, customer files, and computer records of [Infinex and Ridgefield Bank], if any, removed from the [Infinex and Ridgefield Bank] by the Defendant Dise or at his request and/or still in his possession.
(Verified Complaint, Prayer for Relief, pp. 15-16.)
The court ordered that the Defendants show cause why a temporary injunction should not issue on October 30, 2000, the hearing date. The Defendants appeared and filed motions to stay this action in favor of expedited arbitration before the NASD and to compel the Plaintiffs to submit to arbitration before the NASD pursuant to the constitution and bylaws and the Code of Arbitration Procedure. The Defendants also filed multiple objections, as well as voluminous copies of prior decisions by Connecticut courts, courts of foreign jurisdictions and by arbitration panels, in support of their position.
The court conducted the hearing on the temporary injunction over the course of two days, October 30 and November 2, 2000.
Subsequently, Dise filed a request for immediate injunctive relief with NASD Dispute Resolution, Inc., and an arbitrator was appointed. Infinex and Ridgefield Bank filed a motion to dismiss the NASD action, claiming lack of jurisdiction. The NASD arbitrator held a hearing on this matter on November 15, 2000, and, by decision dated November 21, 2000, the arbitrator denied the motion to dismiss. Dise v. Infinex Investments,Inc., NASD No. 00-04757 (November 21, 2000, [O'Neill, Arb.]) (Attached as Appendix). The arbitrator determined that the question as to whether any part of the employment agreement, and its various restrictions on Dise, is enforceable are issues to be resolved at a hearing before a full CT Page 15362 arbitration panel, and not on Dise's application for temporary relief. Id., 5. As to the merits of Dise's application for immediate injunctive relief, the arbitrator did find that:
 1) [Dise] has made a clear showing that he is likely to succeed on the merits of his claims;
 2) [Dise] will suffer irreparable injury unless relief is granted; and
 3) The balancing of the equities lies in [Dise's] favor.
Id.
Pending an in-person hearing, the arbitrator ordered:
 a. that Infinex comply with § 11870 of the NASD Uniform Practice Code and [New York Stock Exchange] Board Rule 412 (which require member firms to cooperate in processing account transfer forms (also known as "ACAT" forms));
 b. that Infinex effect transfers of accounts in compliance with client instructions within three business days, and otherwise pursuant to the rules and regulations of the National Securities Clearing Corporation; and
 c. that Infinex refrain from interfering with the right of [Dise's] clients to receive advice and services from [Dise] or his employer.
Id., 5-6.
 I JURISDICTION
The Plaintiffs, in their memorandum entitled "Plaintiffs' Proposed Findings of Fact and Conclusions of Law," filed November 2, 2000, during the hearing before this court, assert that they have a right to have their dispute with Dise adjudicated by this court. They make this claim based both on the NASD Code provisions permitting use of the courts for temporary injunctive relief and on the terms of the employment agreement between the parties. They claim that absent an order from the court CT Page 15363 compelling Ridgefield Bank and Infinex Insurance, non-members, to arbitrate, the NASD has no authority to assert jurisdiction over a member's objection.
Accordingly, the first issue to be addressed is whether this action is properly before this court, or whether it should instead be first heard by NASD arbitrators or some other arbitration body. The Defendants argue that the Plaintiffs are required to arbitrate this matter before the NASD, pursuant to the NASD Code of Arbitration Procedure. Most cases involving requests for injunctive relief to prevent a broker's use of customer lists are decided by arbitration, pursuant to the rules of the NASD, New York Stock Exchange or some comparable nongovernmental organization. It is not surprising that the Plaintiff's press arbitration in this court, as many arbitration decisions on this issue favor allowing the brokers to continue to work with their customers and do not grant injunctive relief.
The Plaintiffs contend that paragraph 14 of the October, 1996 employment agreement between Dise and Infinex provides for the exclusive jurisdiction of Connecticut courts in resolving this matter. That paragraph states:
 This Agreement shall be governed in all respects by the laws of the State of Connecticut, exclusive of principles of conflict of laws, and, with the exception of matters falling within the purview of paragraph 8, hereof, any dispute hereunder shall be submitted to arbitration in accordance with the rules then in effect of the New York Stock Exchange, Inc. With respect to matters falling within the purview of paragraph 8, you, the Companies hereby consent to the exclusive jurisdiction of the courts of the State of Connecticut and the United States District Court for the District of Connecticut for all purposes.
(Emphasis added.)
Paragraph 8 relates to issues which are the subject matter of this action. It includes, inter alia, restrictions against the disclosure of trade secrets including: names and addresses of customers and information about their accounts; definitions of, and restrictions on the use of, business records after termination of employment; and a one year restrictive covenant prohibiting solicitation of, or doing business with, customers of the Plaintiffs. The Defendants contend that, despite the provision of paragraph 8 relating to jurisdiction over these issues, this court must stay this action pending a determination by an arbitrator CT Page 15364 in accordance with the NASD rules. As outhned above, Dise filed a claim for arbitration with the NASD, and on November 21, 2000, obtained certain temporary relief.
It is well settled that arbitration is "the favored means of settling differences." State v. AFSCME, Council 4, Local 387, AFL-CIO,252 Conn. 467, 473 (2000). The Defendants claim that this public policy requires that all issues presented be resolved by arbitration before the NASD. The Plaintiffs argue that the specific terms of their employment agreement as to jurisdiction should prevail, and the court agrees. In their employment agreement the parties agreed that any dispute involving the issues presented by this lawsuit would not be arbitrated but, rather, would be submitted to a court located in Connecticut. That agreement should be respected and enforced. "Arbitration is a creature of contract between the parties and its autonomy requires a minimum of judicial intrusion. . . . The parties themselves, by the agreement of the submission, define the powers of the arbitrator. . . . The submission constitutes the charter of the entire arbitration proceedings and defines and limits the issues to be decided. . . . When the parties have agreed to a procedure and have delineated the authority of the arbitrator, they must be bound by those limits." Housing Authority v. Local 1303-260,Council 4, 56 Conn. App. 786, 790 (2000). These rules apply whether the agreement provides for arbitration, or, as in this case, the agreement provides that a certain issues will not be arbitrated.
In Merrill Lynch, Pierce, Fenner Smith, Inc. v. Georgiadis,903 F.2d 109, 112 (2d Cir. 1990), a customer brought an action before the American Arbitration Association pursuant to the American Stock Exchange's constitution, which provided that: "if any of the parties to a controversy is a customer, the customer may elect to arbitrate before the American Arbitration Association in the City of New York, unless the customer has expressly agreed, in writing, to submit only to the arbitration procedure of the Exchange." (Internal quotation marks omitted.) Id., 111. The parties agreed, in writing, to the following alternative: "[a]ny controversy between us arising out of such option transactions or this agreement shall be settled by arbitration onlybefore the National Association of Securities Dealers, or the New York Stock Exchange, or an Exchange located in the United States upon which listed options transactions are executed." (Emphasis in original; internal quotation marks omitted.) Id. The court held that the more specific customer agreement, not the constitutional provision of the American Stock Exchange, governed the resolution of their dispute. Id. In the present case, the parties chose a different forum for determination of disputes, including the issues in this case, arising under paragraph 8 of their contract than for others, and as in Georgiadis their specific agreement as to jurisdiction will control. CT Page 15365
Before the court, at present, is the Plaintiff's request for a preliminary injunction and the court will decide the issues related thereto.
 II REQUIREMENTS FOR TEMPORARY INJUNCTION
"It is clear that the power of equity to grant injunctive relief may be exercised only under demanding circumstances. . . . Restraining the action of an individual or a corporation by injunction is an extraordinary power, always to be exercised with caution, never without the most satisfactory reasons." (Citations omitted; internal quotation marks omitted.) Anderson v. Latimer Point Management Corporation,208 Conn. 256, 262 (1988).
To obtain a temporary injunction, the moving party must show: (1) a likelihood of success on the merits; and (2) imminent, substantial and irreparable injury; and (3) lack of an adequate remedy at law; and (4) that a balancing of the equities favors the granting of the injunction.Griffin Hospital v. Commission on Hospitals and Health Care, 196 Conn. 451,457-58 (1985); Lowther v. Hochberg, Superior Court, judicial district of New Haven, Docket No. 338205 (November 4, 1992, Hodgson, J.).
Analysis of the facts and law relating to this request indicate that the Plaintiff has not sufficiently borne its burden and that a temporary injunction should not issue.
 A Likelihood of Success On the Merits
The Plaintiffs seek to enforce restrictive covenant provisions in an employment agreement and to prevent the Defendants from, among other things, doing business with customers Dise obtained while working for the Plaintiffs. They also seek to prevent Dise from using information he obtained from copies of documents he took when he left his employment with the Plaintiffs.
Restrictive covenants, in an employment situation will be specifically enforced only to the extent that it is for the protection of a "legitimate interest" of the employer. New Haven Tobacco Co. v.Perrelli, 18 Conn. App. 531, 536, cert. denied, 212 Conn. 809 (1989). Thus, in determining the Plaintiffs' likelihood of success on the merits, it is necessary to determine if they have a legitimate interest. CT Page 15366
1. Trade Secret
Section 35-50 et. seq. of the General Statutes, the Connecticut Uniform Trade Secrets Act, sets forth the law of trade secrets in this state. Section 35-51 (d) defines a trade secret as: "information, including a . . . customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
The Plaintiff's claim that the list of customers is a trade secret and should be protected. They urge the court to enjoin the Defendants from soliciting, contacting and accepting the brokerage customers with whom Dise established relationships during his employment with the Plaintiffs, and also that they be required to return all information regarding these customers.
In Connecticut, decisions on whether customer lists are protected are fact specific. Robert S. Weiss Associates, Inc. v. Wiederlight,208 Conn. 525, 538 (1988). "Depending on the nature of the business, a customer list may be a trade secret, and an employee may be restrained from using the list if he acquired it in confidence from his employer.There is no trade secret, however, if the customers' names can readily beascertained through ordinary business channels or reference resources." (Emphasis added.) Id. In Wiederlight, the court rejected the plaintiff's claim that customer lists and insurance accounts were trade secrets, noting that the defendant generated the client accounts; the information could be obtained by using telephone directories; and the data on coverage, premiums and expiration dates were kept in open and unlocked files. Id., 539.
Similarly, in Animal Health Clinic v. Autorino, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 571715 (March 13, 1998, Wagner, J.T.R.), the court determined that names of veterinary clients were not trade secrets because clients were "readily ascertainable" and because of the absence of procedures for maintaining the confidentiality of the records. The names and addresses could have been obtained at any time from the individual files of each client, which were stored in an open and easily accessible office area. Judge Trial Referee Wagner found that "[i]t is part of common experience that clientsserved by a professional in one business affiliation will often followthat professional when established in a new affiliation. (Emphasis added.) Id. CT Page 15367
In Early, Ludwick Sweeney v. Steele, Superior Court, judicial district of New Haven at New Haven, Docket No. 409063 (August 7, 1998,Downey, J.), the court determined that the names of a law firm's clients were not a protected trade secret because their names were available and because of the absence of internal office procedures to preserve the confidentiality of clients' names. The court emphasized the nature of the relationship between attorney and client. "Having worked on the cases in question and established relationships with these clients, [the attorney] was entitled to notify them of his change of employer and to signify his willingness to represent them if they so desired." Id.
Here, Dise had full access to the names and information about of his clients. From his personal relationships with them, developed over years of business, civic, and social interaction, he knew their names. A large percentage of these clients had been with him prior to beginning work for the Plaintiffs, had been developed while working for his prior employer, Merrill Lynch, and had followed him because of their confidence and trust in his ability. He could have reconstructed the list of names in his client book and, with the help of a telephone book, could have filled in their addresses and phone numbers. Any other information needed to serve these clients was then available from these clients who had their own copies of their prior statements.
In addition, to qualify for trade secret protection the Plaintiffs are required to show that reasonable efforts were taken to maintain secrecy. General Statutes § 35-51. Dise was never required to leave records regarding his clients at work, or to keep them under lock and key, and no special efforts for secrecy were shown.
The Plaintiffs have failed to show that the information taken or used by Dise was a "trade secret" and it is therefore unlikely that the Plaintiffs will prevail on the merits.
2. Covenant Not to Compete
The Plaintiffs seek to enforce the covenant not to compete found in paragraph 8 of the employment contract between Dise and the Plaintiffs. The Defendants claim that the restrictive covenant is unenforceable on two grounds: one is that, if enforced, Dise would suffer substantial hardship; and two, the covenant interferes with Dise's customers' right to chose their financial advisor. The court agrees with both of the Defendant's assertions, and concludes that the Plaintiffs are unlikely to prevail in their attempt to enforce the restrictive covenant.
There are five factors the court must consider when determining whether a restrictive covenant is enforceable: CT Page 15368
(1) the length of time the restriction operates;
(2) the geographical area covered;
 (3) the fairness of the protection accorded to the employer;
 (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and
 (5) the extent of interference with the public's interests.
Robert S. Weiss Associates, Inc. v. Wiederlight, supra, 208 Conn. 529
n. 2. The five factors are disjunctive, and a finding of unreasonableness as to any one factor will cause the covenant to be unenforceable. NewHaven Tobacco Co. v. Perrelli, supra, 18 Conn. App. 534. Here, the interference with the public's interest is the critical factor.
The three factors the court must consider in determining the reasonableness of a covenant that is alleged to violate the public interest:
 (1) the scope and severity of the covenant's effect on the public interest;
 (2) the probability of the restriction creating or maintaining an unfair monopoly in the area of trade; and
(3) the interest sought to be protected by the employer.
New Haven Tobacco Co. v. Perrelli, 11 Conn. App. 636, 640-41 (1987).
The request to prohibit Dise's use of his list of clients he developed and his work with people with whom he established a trust relationship directly implicates these clients' right to choose their financial advisor and broker. Such interference in the similar relationship between an attorney and client has been held contrary to public policy. Early,Ludwick Sweeney v. Steele, Superior Court, judicial district of New Haven, Docket No. 409063 (August 7, 1998, Downey, J.).
 While a law firm has a legitimate interest in its own survival and economic well-being and in maintaining its clients, it cannot protect those interests . . . CT Page 15369 by, in effect, restricting the choices of the clients to retain and continue the withdrawing member as counsel. . . . Were the court to grant the relief requested, the clients' right to change counsel would be restricted. This would clearly be contrary to public policy.
(Citations omitted; emphasis added; internal quotation marks omitted.) Id.
Surprisingly, this court has found no Connecticut case that directly addresses the nature of the relationship between a securities broker and his or her client, however, many other jurisdictions have and this court finds the logic of some to be particularly persuasive. In GibralterSecurities Co. v. Hugo, N.J. Super.Ct., Ch.Div., No. MRS-C-148-99 (Morris County) (September 24, 1999, Mackenzie, J.S.C.), for example, the New Jersey trial court held:
 A covenant which attempts to protect the clients from contact with the former employee operates to restrict the solicitation rights of the public. Such a covenant, in effect, binds those who are never parties to the agreement. . . . [In so doing, the] agreement restricts the solicitation rights of the public in that they may no longer be able to enjoy the service they have been receiving for years. The nature of [the securities brokerage] business involves close contact between the broker or financial planner and the customer. . . . The better acquainted the broker becomes with the investing needs and financial situations of the customer the better the service. This is an industry that can be very specific to the client and therefore another broker or financial planner may not be initially capable of rendering the same services. [The broker and client relationship is] similar to the relationship between an attorney and client . . . or doctor and patient . . . or an accountant and client.
(Citations omitted; emphasis added.) Id.
 Each member of the affected public has a right to know that the broker with whom he [or she] has entrusted his [or her] accounts, is no longer servicing his accounts because [he] has gone to another brokerage firm. It is in the best interest of the public, therefore, that these affected clients be CT Page 15370 informed of the [new place of employment of their broker] so that they might decide on their own whether to follow [him] . . . or stay . . . to be serviced by another broker there.
Merrill Lynch, Pierce, Fenner Smith v. McCullen, U.S. District Court, Case No. 95-14329 (S.D. Florida) (December 13, 1995, Paine, J.). The Plaintiffs, here, are not restricted from, in good faith, attempting to convince these customers to remain with them.
In American Express Financial Advisors, Inc. v. Mark Williams,
Massachusetts Superior Court, Civ. Action No. 98-2398 (November 10, 1998, King, J.), the court wrote:
 Many courts . . . have recognized the right of the public to freely choose their financial advisors, much like attorneys and physicians. In Meehan [v. Shaughnessy, 404 Mass. 419 (1989)], the Supreme Judicial Court held that a law firm could not restrict a departing partner's right to remove any clients who freely chose to retain him or her as their legal counsel. The Court noted that "the strong public interest in allowing clients to retain counsel of their choice outweighs any professional benefits derived from a professional covenant." . . . The same concerns are present in the instant case. If an injunction were to issue in accordance with the Agreement, Williams would be prohibited from doing business with former clients who seek his services, even in the absence of active solicitation on his part. The class of persons could conceivably include Williams' parents, his spouse, and his child, all of whom Williams provided services to while affiliated with AEFA. A financial planner. such as Williams. stands in a position of trust, much like an attorney or physician, and this Court declines at this stage of the proceedings to interfere wiht [with] the public's. right to choose from whom it seeks professional financial services.
(Emphasis added.)
In Merrill Lynch, Pierce, Fenner Smith, Inc. v. Liniere,572 F. Sup. 246, 249 (N.D.Ga. 1983), the court held that "[t]he public has a greater interest in being able to choose whether to follow its broker to a new firm or to remain at the old firm with a new broker." CT Page 15371
The right of the public to choose those persons with whom they wish to entrust their financial endeavors and decisions is one that should be respected over the desire of the employer to enforce a restrictive covenant. The fact that the Defendants may continue to do business with some of these clients with whom Dise dealt while at Ridgefield Bank does not warrant the issuance of a preliminary injunction at this time.
The Defendants also argue that the issuance of an injunction would be devastating to Dise. The court agrees. The court finds that Dise is the sole provider for his family. The court also finds that Dise has spent over five years building relationships with his clients, some of whom are close family members and friends. To deprive Dise of these clients, particularly those who have close ties with Dise, would deprive Dise of an ability to provide a living for himself and his family. This also militates against granting the requested relief.
 B Imminent Harm and Adequate Remedy At Law
The second and third prongs of the test for a temporary injunction question whether the alleged harm is imminent and irreparable, and whether there is an adequate remedy at law that would address the alleged harm which would obviate the need to grant the extraordinary relief of an injunction. Griffin Hospital v. Commission on Hospitals and Health Care,
supra, 196 Conn. 456; see also Tomasso Bros., Inc v. OctoberTwenty-Four, Inc., 230 Conn. 641, 648 (1994) (an injunction is appropriate only where legal relief is inadequate and there is proof of imminent and substantial harm.). The Plaintiffs argue that "Connecticut case law has held that in cases for violation of a covenant not to compete, there is no requirement of proof of imminent and irreparable harm because it has long been recognized that a restrictive covenant is a valuable business asset which is entitled to protection." (Emphasis added.) (Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 17.) The Plaintiffs cite Custard Insurance Adjusters v. Nardi, Superior Court, judicial district of Ansonia-Milford, Docket No. 061967 (April 20, 2000, Corridino, J.), or this proposition. The Defendants contend that in this case the Plaintiffs cannot demonstrate that they will suffer irreparable harm because there is an adequate remedy at law, i.e., the Plaintiffs could bring a claim for breach of contract.
The Defendants claim that:
 any injury suffered by Plaintiffs due to any actions allegedly taken by Defendants, if proved, will be CT Page 15372 easily compensable by an award of money damages. Every dollar earned by Defendants doing business with those customers Plaintiffs consider their own can be traced precisely. Every trade Defendants execute is documented; every dollar in commission Defendants earn is documented; every dollar from a trade executed by Defendants is documented; every customer who transfers their account from Plaintiffs is documented; any future business Plaintiffs might have earned as a result of Dise's work is knowable to the penny. In short, this is a case, unlike so many others, where mathematical certainty can be affixed to the alleged injury.
(Defendants' Memorandum of Law in Opposition, p. 8.)
The Defendants cite only foreign law in support of this contention. Because the court finds that the Plaintiffs have failed to demonstrate a likelihood of success on the merits, and because the court finds that neither the equities nor the public interest are served by the granting of an injunction in this case, as set forth infra, the court need not come to a conclusion on this question.
 C Balance of Equities and Public Interest
"An injunction is an equitable remedy, and may be denied if the balance of the equities favors the defendant." (Internal quotation marks omitted.) Connecticut Light Power Co. v. Holson Co., 185 Conn. 436, 444
(1981). "In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." (Internal quotation marks omitted.)Tomasso Bros., Inc. v. October Twenty-Four, Inc., supra, 230 Conn. 648. In deciding whether injunctive relief is appropriate, the degree of irreparable harm which may result to each party must be measured and balanced.
The injunction requested would prohibit the Defendants from using Dise's client book with his information about clients whom he has been servicing for years. It would be contrary to public policy to prohibit him from servicing these clients who would include family, business and community associates, friends, and customers solicited with virtually no help from the Plaintiffs.
In balancing the equities, the court must consider the harm which will CT Page 15373 result while awaiting a final determination of this matter. The injunction requested would leave Dise with no client base and no commissions from his regular customers. By reason of the differing financial strength of the Plaintiffs and the individual broker, the effect would bear far more heavily on Dise than on the Plaintiffs, and this enormous disparity supports the denial of an injunction.
The practical effect of granting such an injunction would be to subject Dise to a type of employment servitude, tied for life to an employer unless, at some point, he is willing to forego his years of work developing a client base with the income it produces and begin again with no accounts. Any successful broker would be inextricably tied to his or her employer.
Infinex Investments has approximately one hundred registered representatives, a total aggregate assets in its management in excess of $1 billion, and revenue in 1999 of $13,000,000. The risk of harm to this billion dollar securities corporation and Ridgefield Bank is minimal when compared to that certain to occur to Dise. The equities must tip in favor of the Defendants.
 CONCLUSION
The court finds that jurisdiction before this court is proper on matters concerning paragraph 8 of the 1996 employment agreement. Accordingly, the Defendants' motion to compel arbitration is denied. The court also finds that the Plaintiffs failed to meet their burden of demonstrating that they will prevail on the merits, or that the equities favor the granting of injunctive relief.
Accordingly, the Plaintiffs' request for a temporary injunction is denied.
HILLER, J.
 NASD IMMEDIATE INJUNCTIVE ORDER
NASD DISPUTE RESOLUTION, INC.
In the Matter of the Arbitration Between JOSEPH W. DISE, Claimant, -and- CT Page 15374 INFINEX INVESTMENTS, INC., INFINEX INSURANCE AGENCY, INC., and RIDGEFIELD BANK, Respondents.
NASD No. 00-04757
 ORDER
This cause came on for an immediate injunctive relief hearing pursuant to Rule 10335(d)(1) of the NASD Code of Arbitration Procedure ("Code") and administered through NASD Dispute Resolution Inc. ("NASD Regulation") in New York, New York on November 15, 2000 upon Claimant's Statement of Claim filed with NASD Regulation pursuant to Rule 10335(b) of the Code. NASD Regulation designated the undersigned arbitrator pursuant to Rule 10335(d) of the Code and duly notified the parties of the appointment. In response to the Statement of Claim, Respondent Infinex Investments, Inc. ("Infinex ") filed a motion to dismiss the claim for lack of jurisdiction and a memorandum in opposition to the Claim for various reasons as set forth in said memorandum. The Claimant then filed a memorandum of law in opposition to Respondent's motion to dismiss Respondent then filed a Supplemental Memorandum and the transcript of the proceedings held in the Connecticut Superior Court, Judicial District of Danbury, between the parties on October 30, 2000 and November 2, 2000. The undersigned arbitrator, having read and considered the Uniform Submission Agreement, sworn to October 25, 2000, by the Claimant, and the foregoing pleadings and documents, and having heard the arguments presented by counsel during the November 15, 2000 telephonic hearing, finds as follows.
 MOTION TO DISMISS
Respondent Infinex moves to dismiss Claimant's arbitration claim for lack of jurisdiction on the grounds that (1) Claimant entered into a Mutual Employment Agreement ("Agreement") with Infinex, Infinex Insurance Agency, Inc. ("Agency") and Ridgefield Bank ("Bank");[1] the Agreement provides, inter alia, that, with respect to disputes involving non-solicitation and non-disclosure of confidential business information, Claimant and the Companies "consent to the exclusive jurisdiction of the courts of the State of Connecticut and the United States District Court for the District of Connecticut for all purposes"; (2) the Agreement executed by Claimant and the Companies provides that with the exception of non-solicitation and non-disclosure of confidential business information, all other disputes under the Agreement "shall be submitted to arbitration in accordance with the rules then in effect of the New York Stock Exchange, Inc."; (3) Agency, one of Claimant's employers, is not a member of the NASD and does not consent to arbitrate this matter before the NASD; (4) Bank, one of Claimant's employers, is CT Page 15375 not a member of the NASD and does not consent to arbitrate this matter before the NASD; (5) Infinex, although a member of the NASD, objects to arbitrating this matter before the NASD because it would be contrary to the express and unequivocal agreement of the parties; (6) the NASD lacks subject matter jurisdiction under Rule 10201 over the dispute between Agency and Claimant; and (7) an action in the Connecticut Superior Court has already been commenced which involves all of the parties and would provide total relief. Claimant, in his counsel's oral argument, and in his memorandum opposing the motion to dismiss, argues that (a) Infinex is subject to NASD arbitration as a member of the NASD; (b) Agency and Bank are subject to mandatory NASD arbitration as "associated persons"; (c) Agency and Bank are subject to mandatory NASD arbitration as "certain others"; and (d) the NASD's Insurance Exception does not apply to Agency in this matter.
For the reasons hereinafter set forth, the motion to dismiss for lack of jurisdiction is denied and all of the Respondents are considered parties to this arbitration before the NASD.
The Agreement, Exhibit A to the motion to dismiss, is dated October 31, 1996. Claimant was hired by Bank and Infinex on September 29, 1995 as a registered representative and manager of brokerage services for Bank and Infinex. The Agreement was entered into after Claimant had undertaken his employment with Bank; which is designated in the Agreement as the "Subscriber." Connecticut Association Securities, Inc. ("CTAS"), another party to the Agreement, was the name under which Infinex operated prior to January 11, 1999. At all relevant times, Infinex was and is a member of the NASD. CTAS Insurance Group Inc. ("CIG") is also a party to the Agreement. CIG was the name under which Agency operated prior to January 11, 1999. At all relevant times, Agency was not a member of the NASD. Bank is also not a member of the NASD.
The Agreement provides (p. 1) that Bank had agreed to permit the Companies to offer securities brokerage services and insurance services at a branch at which Claimant was employed It further provides (p. 1) that Claimant was to be a registered representative of Infinex and a licensed insurance producer of Agency. Claimant's duties were to perform those duties customarily performed by one holding the position of a securities representative in a retail securities brokerage firm and insurance agency "in accordance with the Companies instructions." (p. 1) Claimant further agreed that he would "strictly adhere to all applicable state and federal laws, rules, regulations and directives in connection with his employment as a securities representative . . . and all of the rules, regulations and reporting requirements of the Securities and Exchange Commission, the National Association of Securities Dealers,Inc. . . . the relevant laws, regulations . . . of the states in which CT Page 15376 you transact securities and insurance business." (p. 1) (emphasis supplied)
The Agreement further provides that the "Companies shall have the sole and exclusive right to advise, instruct, supervise, direct and control you with respect to your employment as an [Infinex] Representative under this Agreement . . . irrespective of the fact that you are also in (sic) employee of Subscriber [Bank]. (p. 2)
The Agreement further provides that the Claimant's employment as a [Infinex] Representative could be terminated at will by the Claimant or by the "Companies." (p. 2)
The Agreement further provides that in payment for his services, the Claimant agrees to accept the compensation paid to him by the "Subscriber" [Bank] including any fringe benefits. (p. 2)
The Agreement further provides that Claimant agrees that he will "devote all the time, attention, knowledge and skills to the business of the Companies that are necessary to render your duties hereunder in a manner consistent with your performance of services as an employee of Subscriber [Bank]. The Companies will be entitled to all of the benefits, profits or other issues arising from, or incident to, all of the work and services you provide hereunder. . . ." (p. 2)
The Agreement further provides that Claimant, "except at the direction of the Companies," will not disclose trade secrets as defined therein; however, it then states that: "[t]his paragraph shall not apply if Subscriber [Bank] continues to offer investment products through its own broker-dealer or insurance agency or another third-party marketing firm and you continue to be employed or otherwise associated with Subscriber [Bank]." (p. 3)
The Agreement prohibits Claimant from soliciting, contracting or accepting the securities brokerage business of any customer whose name became known to him as a result of his employment as an Infinex Representative. However, this prohibition is also conditioned on the Bank's continuing its subscriber agreement with Infinex and Agency. Specifically, the Agreement states that the provisions of paragraph 8(c) "shall not apply if [Bank] continues to offer investment products through its own broker-dealer or insurance agency or another third-party marketer, and you continue to be employed or otherwise a associated with Subscriber [Bank]." (p. 4)
The Agreement also provides that "with the exception of matters falling within the purview of paragraph 8, hereof, any dispute hereunder shall be CT Page 15377 submitted to arbitration in accordance with the rules then in effect of the New York Stock Exchange, Inc. With respect to matters falling within the purview of paragraph 8 you and the Companies hereby consent to the exclusive jurisdiction of the courts of the State of Connecticut and the United States District Court for the District of Connecticut for all purposes." (p. 5)
Relying primarily on the provisions in the Agreement and cited case law and authorities, Respondents contend that the NASD lacks subject matter jurisdiction over this proceeding:
I do not agree that the Agreement relieves the parties from arbitrating their employment dispute before the NASD.
Prior to being employed by the Respondents, the Claimant had signed a Form U 4 (Ex. 1 to Affirmation of Anthony Paduano, Esq.) which contains the following language:
 "I agree to arbitrate any dispute, claim or controversy that may arise between ate and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Item 11 as may be amended. . . ."
When the Claimant was first employed by Respondent Bank as a registered representative, he remained subject to the above obligation to arbitrate all disputes required to be arbitrated under the NASD rules. Later, when he signed the Agreement, he continued to remain subject to these obligations.
It is unquestioned that both the Claimant and . . . all the Respondents contemplated arbitration in given circumstances. Indeed, ¶ 14 of the Agreement attempts to designate the New York Stock Exchange as a forum for the arbitration of certain dispute. but the language of the section is imprecise, i.e. it provides for arbitration "in accordance with therules then in effect of the New York Stock Exchange, Inc." Presumably, the parties intended to say that any such arbitration would be at the NYSE but they did not so stated.[2] Nevertheless, it is clear that the parties intended to arbitrate before some forum and there are sufficient contacts with the NASD to indicate that it should be the forum for this dispute.
Traditionally, agreements to arbitrate are enforced by the courts. DeanWitter Reynolds Inc. v. Byrd, 470 U.S. 213 (1984). Accord, Moses H. ConeMem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n. 32 (1983). The CT Page 15378 disputes under the Agreement in question should be heard before the NASD in an arbitration proceeding, not before the Connecticut cowls.
Respondents also argue that the NASD lacks jurisdiction over Agency and Bank because they are not members of the NASD, are not persons "associated with a Member" and do not fall within the scope of "certain others" to be joined in an NASD arbitration.
Based on the reasoning of the Court in McMahan Securities Co. L.P. v.Forum Capital Markets L.P., 35 F.3d 82 (2d Cir. 1994), I disagree with the Respondents and find that Agency and Bank are "others" within the meaning of Section 10101 of the Code and, therefore, are properly joined as parties in this arbitration.
 "A person who is neither a member nor an associated person is nevertheless appropriately joined in the arbitration where that party plays an active role in the securities industry, is a signatory to a securities-industry arbitration agreement (or is an instrument of another party to the arbitration), and has voluntarily participated in the particular events giving rise to the controversy underlying the arbitration (citing case)." 35 F.3d 82, 88.
Respondents also argue that the Code specifically excepts from mandatory arbitration disputes involving the insurance business of any member which is also an insurance company. In the matter before me, the insurance exception does not apply because the dispute is not fundamentally about insurance.
In his opposition memorandum and in oral argument, Claimant contends that the Agreement is not supported by adequate consideration. In support of that argument, Claimant cites to Dick v. Dick, 167 Conn. 210, 224
(1974) for the proposition that an employee who has already commenced employment and receives no additional consideration for signing a covenant not to compete is not subject to enforcement of the covenant because past consideration cannot support the imposition of a new obligation. Whether or not the Agreement and its various restrictions upon Claimant are enforceable are issues which will be resolved at a hearing before a full Panel and not on this record at this time.
As to the merits of Claimant's application for immediate injunctive relief I find that:
 1) Claimant has made a clear showing that he is likely to succeed on the merits of his claims;
CT Page 15379
 2) Claimant will suffer irreparable injury unless relief is granted; and
 3) The balancing of the equities lies in Claimant's favor.
Therefore, pending an in-person hearing pursuant to NASD Rule 10335(d)(1) to be scheduled by the Director, IT IS ORDERED:
 a. that Infinex comply with § 11870 of the NASD Uniform Practice Code and NYSE Board Rule 412 (which require member firms to cooperate in processing account transfer forms (also known as "ACAT" forms);
 b. that Infinex effect transfers of accounts in compliance with client instructions within three business days, and otherwise pursuant to the rules and regulations of the National Securities Clearing Corporation; and
 c. that Infinex refrain from interfering with the right of Claimant's clients to receive advice and services from Claimant or his employer.
This Order shall remain in effect until such time as an expedited hearing on the merits, pursuant to Rule 10335(f) of the Code, is conducted.
November 21, 2000 New York, New York
James P. O'Neill, Esq., Arbitrator